**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

JAMIE R. SHRIER,            )
                                                   )
               Plaintiff,         )
                                                   )
vs.                                 )       Case No. 10-cv-555-TLW
                                                 )
MICHAEL J. ASTRUE,         )
Commissioner of the Social Security   )
Administration,                  )
                                                 )
             Defendant.     )

## OPINION AND ORDER

Plaintiff Jamie R. Shrier, pursuant to 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying her application for disability benefits under Title XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 9). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. § 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. § 416.913(a).

## Background

Plaintiff was born January 1, 1981 and was 28 years old at the time of the ALJ's decision. (R. 110). She is married with two small children. (R. 32, 156-157). She did not graduate high school, completing the 11th grade, and did not obtain her GED. (R. 36-37). She was placed in foster care for two years following the death of her mother, as her father was abusive. (R. 37). Her former work includes a waitress, grocery clerk, car hop, and a kitchen helper. (R. 45).

Plaintiff last worked in April, 2008, and she has not attempted to work since due to her symptoms of depression, anger, and crying spells. (R. 29-30). She last worked as a waitress at Cracker Barrel and was asked to turn in her resignation after being written up twice for her outbursts of anger. (R. 30, 38). She claims she cannot get along with other people, that her "depression and [] anger and everything, it just, it controls [her] life." (R. 30-31).

Plaintiff discusses prior drug use (methamphetamine and marijuana), admitting the last time she used marijuana[1] was in April, 2009, however, she denies being addicted. (R. 31). Plaintiff claims that she used marijuana in April 2009, because her medications were not helping her symptoms of anxiety. (R. 31, 33). She claims her doctor changed her medication, and "it seemed to help." (R. 31). She was arrested twice (2001 and 2002) for possession of marijuana and paraphernalia. (R. 33).

Plaintiff says the longest she held a job was for six months when she was sixteen years old. (R. 32). She has not tried to work since her last job, because she feels she is not "able to hold a job down." (R. 33).

---

[1] Plaintiff stated she has not used methamphetamine since August, 2005 when her son was born with drugs in his system and DHS stepped in, removing both children from the home. (R. 34-35). Plaintiff attended parenting classes, required meetings, and counseling to regain custody of her children. (R. 35, 36).

Plaintiff states she takes one milligram of Xanax three times a day for anxiety. (R. 35). She claims "Dr. Gates" diagnosed her with bipolar disorder, post-traumatic stress disorder, and anxiety in November of 2007. Plaintiff describes symptoms of not wanting to get out of bed, depression leading to suicidal feelings (once so far in 2009), anger making her "[f]eel like hurting people sometimes," although she claims she has not hurt anyone other than when she fought in school. (R. 39). Plaintiff states she attempted suicide twice, once by cutting her wrist, and once by overdose, both resulting in hospitalizations. (R. 40). She also describes manic episodes, occurring two or three times a week (while on medication) that make her feel she can accomplish anything. (R. 41). She claims to experience panic attacks at least once a week, often while driving, that leave her shaky and feeling she is gasping for air. (R. 41).

Plaintiff claims to have no friends other than her husband. She is afraid of losing control and states she does not get along well with other people. She states she is only able to concentrate on housework approximately fifteen minutes at a time. (R. 45). Plaintiff claims to have nightmares three to four times a week, migraines two to three times a month, and asthma. (R. 42). She was hospitalized in September 2009 with pneumonia and says the doctor diagnosed "early onset asthma," but she claims she was first diagnosed as a child, although she did not obtain those records. (R. 43, 44).

According to a Disability Report – Adult (R. 135-144), plaintiff's limiting condition is "bipolar." (R. 135). She listed "dealing with people/emotional/flashbacks" in answer to "How do your illnesses, injuries or conditions limit your ability to work?" Id. She claimed she became unable to work on February 17, 2008. She listed her medications as wellbutrin (anti-depressant), serequel (medication to treat bipolar disorder), depacote (an anti-seizure medication also used to treat manic episodes of bipolar disorder), and diazepam (for anxiety). (R. 143). A medication

form dated October 13, 2009 shows plaintiff taking Ambien (sleep aid), perphenizine (an anti-psychotic), Elavil (anti-depressant), and Lamictal (maintenance medication for bipolar disorder). (R. 216).

Plaintiff's husband completed a Function Report – Adult – Third Party form (R. 148-155). He claimed his wife's daily activities included feeding the kids, watching TV, getting their daughter ready for school, eating lunch, sleeping, then dinner. (R. 148). Later, he also stated she "is able to do chores," but she needs encouragement to do it. (R. 150). According to Mr. Shrier, plaintiff is able to drive, shop for groceries weekly, cook, go to the lake, and visit with her grandmother and mother-in-law. (R. 151-152). She cannot handle money or pay bills, has "conflicts" which prevent her from getting along with family, friends, neighbors, or others. She "gets antsy," unable to sit still, and jumps from one project to the next without completing any. (R. 152-153). He also mentioned her "moods got her fired because of anger." (R. 154).

Plaintiff completed a Function Report – Adult (R. 156-163), dated June 2, 2008, claiming she cares for all the needs of her two children and cares for her husband, performs all household chores "when I'm not feeling emotional or anything." (R. 156). Her hobbies included sewing, outings, swimming, cookouts, and shopping for new clothes. She claims to no longer do these things, saying "maybe 2 or 3 times in 6 months do I do anything at all." (R. 160). Plaintiff stated she does not handle changes in routine well, stated she has noticed the intensity of her mood swings, knowing she is ill is hard to accept, and that she is afraid of the "ups and downs in life." (R. 162).

Plaintiff completed a second Function Report – Adult form (R. 176-183), one month later. In this form, she claims to take care of her children and husband with help from her mother-in-law, that her sleep is disturbed by frequent waking and dreams, that she cooks (but not

as much as in the past), performs household chores, but that she has "stopped doing these things as much so I get gripped at a lot." (R. 178). She claimed she does not do as much housework due to being tired or "hav[ing] a headache all the time." (R. 179). She goes outside to smoke, take out the trash, and take her kids to play. She goes to the park, doctor, and grocery store on a regular basis, and while spending time with others, she likes to cookout and have conversations (R. 180), yet she claims she has no social activities. (R. 181).

Records from St. John Medical Center dated July 24, 1996 to August 19, 1996, document plaintiff's suicide attempt at age 15 by overdose three months after her mother passed away in a motor vehicle accident. (R. 297-316). An additional suicide attempt in January, 1996 is also noted in the St. John records, but not in record form. (R. 313). The admission was inpatient treatment for depression, anger, and sleep issues. Plaintiff was discharged August 19, 1996 with Zoloft and with instructions for periodic use of albuterol inhaler as needed for reactive airway disease symptoms. (R. 299).

The record next shows several visits to Southcrest Hospital's emergency room spanning July, 2002 to January, 2003. The first of these visits was on complaint of abdominal pain, with a diagnosis of an ovarian cyst. (R. 405-416). The other visits include treatment for trouble with a pregnancy (R. 417-429, 443-458, 459-469), and a headache with a viral infection (R. 430-441).

Records from Tulsa Regional Medical Center (January 25, 2003-August 3, 2005) show complaints of shortness of breath, for which she was instructed to stop smoking, use an albuterol inhaler every four waking hours for three days, and follow up with her obstetrician in five to seven days. (R. 505-509). She left Tulsa Regional Medical Center without being seen on April 16, 2004. (R. 503-504). On November 24, 2004, plaintiff was seen for a fetal status check. She was positive for marijuana, gestational diabetes, and asthma. (R. 501-502).

Plaintiff was seen on an inpatient basis at Parkside, Inc. from August 15, 2003 to August 21, 2003. (R. 347-386). She described in detail molestations, forced use of methamphetamine, her parents being killed by a drug cartel, and fear for her safety due to threats from the same cartel. Upon discharge, she was diagnosed with bipolar disorder, recurrent with psychotic features, post-traumatic stress disorder ("PTSD"), cannabis abuse, benzodiazepine dependence and withdrawal, polysubstance dependence, and anxiety disorder, NOS under Axis I. Axis II was diagnosed borderline personality traits; Axis III, asthma; Axis IV, primary support group, social environment, occupational, educational, and economic problems with an Axis V GAF score of 40. (R. 349). Plaintiff followed-up with Parkside, Inc.'s chemical dependency intensive outpatient treatment program, where she attended group therapy sessions and medication management appointments. (R. 373-377). She became noncompliant with sessions, and her therapist believed she was not being honest about her drug use. Plaintiff was discharged October 12, 2003 with a referral to Family and Children's Services for case management and/or therapy. (R. 377-378). Plaintiff returned to Parkside May 4, 2004, stating she was there for "therapy," and that her doctor was "trying to wean [her] off Xanax." (R. 378). She was seen by John B. White, M.D., who treated plaintiff during her inpatient stay in 2003. Dr. White recommended inpatient detoxification, but plaintiff stated she preferred outpatient treatment as she was being detoxed by "OSU physicians"[2] on an outpatient basis. (R. 381). Plaintiff was scheduled for counseling sessions, several of which she did not keep. (R. 380-382). She was seen for a medication management appointment with Dr. White on June 9, 2004. (R. 382-383). Dr. White noted plaintiff appeared "calmer, and healthier than I had ever seen her." (R. 382). He stressed his opinion that plaintiff needed to regularly attend counseling sessions in addition to medication.

---

[2]  No records were submitted by OSU Medical Center. (R. 392-394).

She asked Dr. White to see her again in one month, and he did not write her any additional prescriptions. (R. 383). She was seen once by Verletta Russell, MS, LPC on June 30, 2004 for a counseling session. The session with Russell and the follow up visit with Dr. White are the only appointments she kept. (R. 383-384). Plaintiff was discharged August 9, 2004 to self-care, reporting she was "doing ok." (R. 384-386).

On March 31, 2004, plaintiff presented to Southcrest Hospital's emergency room with a panic attack, asking for Xanax. She did not receive it, as the emergency room doctor suspected drug seeking behavior. (R. 470-482). Next, plaintiff presented to Hazem Sokkar, M.D., a psychiatrist, on March 31, 2006 complaining of depression and anxiety. (R. 224-243). Dr. Sokkar treated plaintiff through June 21, 2007. Dr. Sokkar noted on plaintiff's intake form she "was evaluated by a psychologist Dr. Michael Martin on 1/17/06." (R. 240-241). Dr. Martin did not return any records to the SSA. (R. 387-388). Dr. Sokkar diagnosed plaintiff as follows: Axis I – bipolar disorder, generalized anxiety disorder; no Axis II diagnosis; Axis III – asthma; Axis IV – problems related to interaction with the legal system/crime; and Axis V – GAF score of 60. He prescribed Prozac (anti-depressant), Alprazolam (anti-anxiety), and Abilify (anti-depressant; helps with bipolar). (R. 242-243). On April 28, 2006, plaintiff reported her anxiety "has been under control after she started taking Alprazolam," that she was happy because the court returned her children to her,[3] she complained of problems with concentration and requested medication for attention-deficit/hyperactivity disorder ("ADHD"). (R. 239). Dr. Sokkar discontinued Prozac, added Strattera (to treat ADHD), continued the Alprazolam, and increased her Abilify. Id. Progress notes through the end of 2006 all show plaintiff "doing well" on her medication regimen. (R. 234-239). In February, 2007, plaintiff reported Chantix "made her

---

[3] Plaintiff's children were removed from the home when she tested positive for methamphetamine while pregnant with her second child. (R. 241).

smoke less," and her Abilify prescription was increased due to reported mood swings and depression. (R. 231). Remaining treatment notes through June, 2007 show plaintiff continued to do well on the medication regimen, all with no reported side effects or medication abuse. (R. 226-230).

Plaintiff presented to Family and Children's Services for treatment for depression and anxiety between February 11, 2008 and April 20, 2009. (R. 247-268, 317-346). She was diagnosed with PTSD, bipolar disorder, and anxiety. She was given celexa for mood and anxiety, and topomax for headaches. (R. 254-256). Plaintiff consistently reported no suicidal or homicidal ideations. She did report one instance of having a knife, intending to slit her wrist, "but nothing came of it." (R. 328). During a medication management session, Tracy Loper, M.D. stated a suspicion of "shopping for a receptive doctor for amphetamine and BZD." (R. 261). Notes from late 2008 and through 2009, show Family and Children's Services attempting to assist plaintiff in obtaining free medication through the Patient Assistance Program ("PAP"). (R. 332, 334-336, 341-344). Plaintiff called in on April 8, 2009, complaining she felt her doctor "isn't hearing [her]," and requested Xanax for her anxiety. She also admitted she had been smoking marijuana to "deal with my anxiety." She was informed she could not change doctors because he would not give her the medications she requested, and she was instructed to utilize their walk-in "med clinic" to try to change her medications. (R. 333).

Family and Children's Services records dated March 23, 2009 through September 19, 2009 acknowledge plaintiff's history of depression and anxiety, and that her medications were adjusted. (R. 395-404). Additional records from Family and Children's Services were submitted to the Appeals Council on March 19, 2010. These records are dated February 11, 2008 through March 4, 2010. (R. 510-517, 518-530). Plaintiff stated depression and anxiety were still

problems, but were better than prior visits, that she had been working on deep breathing exercises which helped, that she had experienced "anger outburst and depression but this [sic] was not as [sic] an area of concern," her asthma was controlled and she did not mention headaches in these sessions, and stated that overall, she was happy with her current status and progress. (R. 515, 523). She was encouraged to pursue psychotherapy to increase her coping skills. (R. 528).

Records submitted by Douglas W. Holte, M.D., dated August 7, 2008 through September 17, 2008 (R. 292-295), show plaintiff presented complaining of trouble with bipolar, "really bad nightmares," irritability, and thoughts of harming herself. (R. 293). She was prescribed Seroquel and Xanax. Id.

Plaintiff was seen October 15, 2008 at Southcrest Hospital's emergency room complaining of a migraine headache. (R. 483-496). She was treated and released with a prescription for hydrocodone/acetaminophen, 10mg/500mg. (R. 486).

Plaintiff was sent to Minor W. Gordon, Ph.D. on July 19, 2008 for an agency psychological evaluation. (R. 269-273). Dr. Gordon discussed plaintiff's reported history, noting no medical records accompanied the evaluation request. (R. 271). He went on to summarize his observations and testing as follows:

> In summary, [plaintiff] is a 27 year-old married female who alleges having problems with her mood to include highs and lows as well as problems with anger and being irritable when around a group of people as her primary rationale for her application for disability benefits. At age 27, she has an extensive history of inpatient psychiatric treatment. [Plaintiff] explained the level of dysfunction in her home and the fact that she lost her mother at age 15 in an auto accident and she lost her father the following year in a separate auto accident. This examiner discussed with [plaintiff] at length about the reason she has difficulty getting along with others and she ultimately agreed that her coping mechanism as a youngster was to turn to inpatient psychiatric services as her first line of defense for being unable to comfortably interact in a social circumstance. To date, she does not appear to have learned to interact appropriately and comfortably in a

social circumstance and avoid [sic] same accordingly. [Plaintiff's] activities of daily living are thought to be close to normal. She spends her time maintaining the home and caring for her two preschool aged children. She is taking a number of psychotropic medications. Her bipolar disorder is in fair remission with her current medication regimen. She is currently in therapy at Family and Children's Services. [Plaintiff] would have difficulty communicating with the general public but most likely could communicate with co-workers and supervisors on a superficial level for work purposes.

(R. 272). Dr. Gordon diagnosed plaintiff with bipolar disorder, in fair remission with her current medication regimen and social anxiety disorder, and assigned her a GAF score of 60. Id.

Adopting Dr. Gordon's evaluation, Tom Schadid, Ph.D. completed a mental RFC form for plaintiff on July 29, 2008 (R. 274-277), rating her moderately limited in her ability to remember, understand, and carry out detailed instruction, and markedly limited in her ability to interact appropriately with the general public. In summary of his findings, Dr. Schadid stated:

At the maximum the clmt is:
Able to understand and remember simple and some more detailed instructions;
Able to carry out simple and some more detailed instructions with routine supervision;
Able to relate appropriately with supervisors and coworkers for work purposes, but not with the general public;
Able to adapt to a work setting.

Clmt's allegations and presentation of sxs are considered credible.

(R. 276).

Dr. Schadid also completed a Psychiatric Review Technique form at the same time he completed the mental RFC. (R. 278-291). He rated her restriction of daily living activities as mild, difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace were both rated moderately limited, with no episodes of decompensation. (R. 288). Dr. Schadid found the evidence did not establish the presence of the "C" criteria for evaluated categories of 12.02, 12.04, or 12.06. (R. 289).

Carolyn Goodrich, Ph.D. independently reviewed the record on September 25, 2008 and concluded Dr. Schadid's assessment was accurate. (R. 296).

## Decision of the Administrative Law Judge

At step one of the five step sequential evaluation process, the ALJ found has not engaged in substantial gainful activity since April 16, 2008, her application date for Title XVI benefits.[4] (R. 13). At step two, the ALJ determined plaintiff's severe impairments to be bipolar disorder and anxiety. Id. He also found plaintiff's allegations of migraine headaches and asthma to be non-severe impairments. Id. At step three, the ALJ determined plaintiff's severe impairments did not meet or equal a listing, specifically considering 12.04, Affective Disorders, and 12.06, Anxiety Related Disorders. Id. Before moving on to step four, the ALJ assigned the following RFC to plaintiff:

> … [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The [plaintiff] is able to have limited contact with the general public. The [plaintiff] is able to understand and carry out simple repetitive work with routine supervision.

(R. 15). At step four, the ALJ determined plaintiff could return to her past relevant work of kitchen helper and car hop, effectively ending the five step process. (R. 19). As an alternative finding, the ALJ also determined there were other jobs in significant number in the national economy which plaintiff could perform, to include a bus person, a janitor, and a motel housekeeper. (R. 20). The ALJ therefore concluded plaintiff had not been under a disability as defined by the Act, since April 16, 2008, the date of her application.

---

[4] A claimant is not eligible for SSI benefits prior to the application filing date. 20 C.F.R. §§ 416.335, 416.501. In the instant case, plaintiff alleged a disability onset date of February 17, 2008, however, the relevant period began when she protectively filed her application for SSI benefits, April 16, 2008.

**Issues on Appeal**

Plaintiff states the ALJ's decision should be remanded with instruction or for award of benefits due to the following alleged errors:

1. The ALJ failed to propound a RFC consistent with substantial evidence in the record;

2. The ALJ failed to inquire into the reliability of the vocational expert's ("VE") conclusions after counsel objected to her testimony; stating he did not rule on counsel's objections or discuss the ruling in his decision; and

3. The ALJ failed to determine and make findings regarding the mental demands of plaintiff's past relevant work before ruling that she could return to that work.

**Discussion**

Plaintiff's first allegation of error contains several sub-errors, which will be addressed in order of appearance. The first sub-error complained of is that the ALJ "chose to ignore [plaintiff's] treating physicians' diagnoses of PTSD and ADHD," and that he failed to evaluate "their opinions or assign any weight to them." The Court disagrees. No treating source submitted an opinion of plaintiff's functional limitations for analysis by the ALJ, and plaintiff failed to identify any treating source records that were not discussed by the ALJ. Plaintiff simply broadly mentions records reflecting diagnoses from Parkside Hospital in 2003, Family and Children's Services in 2008, and Dr. Hazem Sokkar from 2006 to 2007, but fails to point out specific opinions from these providers to substantiate her claim. (Dkt. # 15 at 3). The Court is unable to find any treating source opinion in the record to which the ALJ could apply the Goatcher factors. See Goatcher v. Chater, 52 F.3d 288, 290 (10th Cir. 1995). Moreover, the ALJ did in fact consider plaintiff's diagnoses of PTSD and ADHD. (R. 16-17). The ALJ stated he carefully considered the entire record before determining plaintiff's RFC. (R. 15). An ALJ is not required to discuss every piece of evidence. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th

Cir.1996).  "[W]here, as here, the ALJ's decision states that he considered all of the evidence, 'our general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.'" (citing <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1173 (10th Cir.2005)).

Next, plaintiff complains the ALJ did not consider GAF scores from her inpatient stay at Parkside Hospital in 1996, or St. John Medical Center in 2003, or consider the stays to be "episodes of decompensation."  (Dkt. # 15 at 4).  Plaintiff's counsel is overlooking the fact that plaintiff was able to sustain some substantial gainful activity during the period between the date of these records and her alleged onset date.  (R. 125-126).  Plaintiff's counsel also overlooks the fact that she was assessed with GAF scores ranging from 50 to 60 in more recent medical records, including those from Family and Children's Services and Dr. Sokkar.  (R. 240, 331).

It is clear from plaintiff's treatment records that she showed improvement in her diagnoses of bipolar disorder, anxiety, PTSD, and ADHD while compliant with prescribed medications.  (R. 226-243, 345).  The consultative examiner found plaintiff's bipolar disorder was "in fair remission with medication."  (R. 272).  Thus, plaintiff's records from 1996, which evidence an episode of decompensation when plaintiff was a teenager, are not relevant to this finding of disability.  Even so, the ALJ considered these records as well as plaintiff's subsequent records from Dr. Sokkar, and Family and Children's Services.  (R. 16-18).  A claimant for Title XVI benefits under the Social Security Act must demonstrate a disability lasting for at least twelve consecutive months which prevents him or her from returning to gainful employment. According to 20 C.F.R. §§ 416.203(b), 416.335, and 416.501, a claimant is only eligible for payment of any benefits beginning the month after the month in which the claimant meets all eligibility requirements.  In the instant case, plaintiff argues the relevant time frame is all time

before the ALJ's decision. The regulations do not support this theory. A finding of disability cannot be made based upon evidence ten years before the application date, while in the intervening years, plaintiff showed improvement in her condition.

The ALJ discussed evidence during the relevant time frame (April, 2008 through his decision), and consistent reports by plaintiff to her treating sources that she experienced no suicidal or homicidal ideations. (R. 16-18). Thus, the Court rejects this line of reasoning as substantial evidence supports the ALJ's omission of lower GAF scores from almost a decade before plaintiff is alleging disability.

Plaintiff next argues that the ALJ's credibility analysis was faulty, because he used boilerplate language, "yielding no clue to what weight the ALJ gave the testimony." (Dkt. # 15 at 5). The Court disagrees. In Rhodes v. Barnhart, 117 Fed.Appx. 622, 629 (10th Cir. 2004) (unpublished), even though the ALJ came close to using improper boilerplate language, the credibility determination was affirmed when the ALJ's "basic thrust" was supported by substantial evidence. See also Mann v. Astrue, 284 Fed.Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points). Here, even though the ALJ used some boilerplate language, he fully discussed the factors used in determining the credibility of plaintiff, and he specifically set forth the evidence on which he relied.

The ALJ mentioned plaintiff was primarily seeing Dr. Sokkar as "part of a condition to regain custody of her children after her youngest child was born with methamphetamine in his system." He went on to note these treatment records usually indicated plaintiff's mood was "good" or "fair, affect was congruent, speech was coherent and goal directed and she denied suicidal or homicidal ideation. Attention, concentration, memory, judgment and insight were

intact." (R. 18). The ALJ discussed gaps in her treatment records, noting a year-long gap between treatment with Dr. Sokkar and treatment with Family and Children's Services. He further noted records from Family and Children's Services that indicated plaintiff displayed drug seeking behavior, and that plaintiff had herself reported continued use of marijuana. (R. 19). The ALJ continued his credibility discussion, mentioning that plaintiff and her husband both described that plaintiff is able to perform normal daily activities, prepare meals, take care of her children, play with her children, drive, shop, visit, host cook outs, and take her kids to the park. The ALJ noted that while plaintiff stated she was unable to perform housework or yard work, her husband reported that she is able to do the chores. Id. Finally, the ALJ noted plaintiff's "sporadic" work history prior to her alleged onset date, which he stated "raised the question as to whether [plaintiff's] continuing unemployment is actually due to medical impairments." Id. The ALJ identified the specific evidence he relied on, and his credibility determination is supported by substantial evidence.

Further, an ALJ's credibility findings warrant particular deference, because he is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2001). The ALJ accurately set forth the relevant factors and thoroughly discussed plaintiff's complaints and alleged symptoms that he considered in assessing plaintiff's credibility. The ALJ further tied his credibility finding to specific evidence and explained why plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 15). The ALJ complied with the standard in Kepler v. Chater, 68 F.3d 387 at 391 (10th Cir. 1995), by referring to and linking the specific evidence he is relying on to the credibility determination. The Tenth

Circuit has made clear that "our opinion in <u>Kepler</u> does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of <u>Kepler</u> are satisfied."  <u>Qualls v. Apfel</u>, 206, F.3d 1368, 1372 (10th Cir. 2000).  Based on the foregoing, the Court finds that the ALJ affirmatively linked his credibility findings to substantial evidence.

The final "sub-error" plaintiff raises as an objection regarding the RFC determination is that the ALJ did not consider all her impairments in formulating her RFC, because he did not discuss migraine headaches or asthma.  Again , the Court disagrees.  The ALJ found both plaintiff's migraine headaches and asthma to be non-severe impairments at step two of his analysis, specifically stating:

> The claimant has alleged disability, in part, due to migraine headaches.  …  [T]his impairment is considered non-severe, as medical and other evidence establish only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  The only mention of a migraine headache in the medical evidence is an emergency room visit on October 15, 2008 at Southcrest Hospital.  (Exhibit 23F).

> The claimant has alleged disability, in part, due to asthma.  …  [T]his impairment is considered non-severe, as medical and other evidence establish only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.

(R. 13).  Plaintiff fails to cite any medical evidence to contradict the ALJ's finding.  Further, the ALJ stated he carefully considered the <u>entire</u> record, including non-severe impairments, when formulating plaintiff's RFC.  The Court is not allowed to reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Qualls</u>, 206 F.3d at 1371.  The record supports the ALJ's finding.  Aside from Exhibit 23F, mentioned by the ALJ, migraine headaches are mentioned in plaintiff's reported history to other physicians, "[p]art. has been diagnosed with asthma and reports migraines."  (R. 328).  In 2009, Family and Children's Services noted, "Participant has been diagnosed with asthma and reports migraines on previous assessment but

client stated her asthma is controlled, and no mention of migraines were brought up as problematic during this session." (R. 515, 523). The same holds true with plaintiff's asthma. A physical or mental impairment must be established by medical evidence, not merely symptoms. 20 C.F.R. § 416.908. Thus, the Court finds the ALJ applied the correct legal standards and substantial evidence supports his RFC determination.

Plaintiff's second allegation of error, that the ALJ failed to inquire into the reliability of the vocational expert's ("VE") conclusions after counsel objected to her testimony, that he did not rule on counsel's objection, or that he did not discuss the ruling in his decision, is without merit. Plaintiff's counsel at the hearing objected to the fact that the VE did not have copies of the materials she relied upon for the number of jobs quoted for the alternate jobs found at step five. In reviewing the hearing testimony, it is clear the ALJ viewed this as an objection to the VE's qualifications as an expert, and counsel clearly did not wish to withdraw her statement of no objection to the VE's qualifications:

> [Counsel]  Q:  You don't have copies of any of those do you?
>
> [VE]  A:  Copies of what?
>
> [C]  Q:  Any of the, the sources that you've --
>
> [VE]  A:  Well I don't -- no I don't have them with me.
>
> ATTY:  Your Honor, if the VE is not able to provide me with copies of her sources, I'm going to object on the grounds that I'm entitled to examine those sources.  I don't have any other questions.
>
> ALJ:  Examine what witness?  Examine what witness?
>
> ATTY:  The sources of her job numbers.  I believe I'm entitled to see
>
> ALJ:  She told you what the source of the job numbers are.
>
> ATTY:  And I'm asking for them so I can examine them.  And she said she didn't have them.  So I would like --
>
> ALJ:  You've lost me.  You asked her for the sources of the job number, right?  Is that where

ATTY:  I asked her where she got the numbers.

ALJ:  Okay.  Did you answer that question?

VE:  Yes I answered the sources that I use.

ALJ:  Okay.  What else do you need?

ATTY:  And I asked her for copies of the materials that she referred to, to reach her conclusion.  And I believe that she told me that she didn't have --

ALJ:  Well you're getting awfully close to questioning her competency as an expert witness.  Now you already posed no objection to, to her qualifications as an expert in the field.  Now, now you're going back and you're going to ask her about **--** you want to test her credibility?  Is that what you're doing, test her credibility as to, as to what she's saying in her field

ATTY:  Your Honor, what I

ALJ:  that she's been qualified as an expert in many times?  You, you want to go back to that?

ATTY:  No.

ALJ:  Do you want to withdraw your statement that you had no objection to her qualification?

ATTY:  No, Your Honor.  I don't believe that's what I'm doing.

ALJ:  I believe that's what you're doing.  And what I believe is what counts here.

ATTY:  Okay.  It's just – I'd like to note my objection on the record.  I don't have any other questions.

ALJ:  It's noted.  Do you have anything else, Ms. Blog?

ATTY:  No, Your Honor.

(R. 50-51).  Plaintiff argues that the ALJ erred by relying on the VE's testimony without "first ascertaining that she had a proper foundation for her opinions," relying on a Seventh Circuit case to argue her point (dkt. # 15 at 8):

> We have recognized that the standards by which an expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Evidence.  Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir.2002).  Nevertheless, because an ALJ's findings must be supported by substantial evidence, an ALJ may depend upon expert testimony only if the testimony is reliable.  Id.  ("Evidence is not 'substantial' if vital testimony has

been conjured out of whole cloth."); see also Consol. Coal Co. v. Stein, 294 F.3d 885, 893 (7th Cir.2002) (parties to an administrative proceeding must satisfy the ALJ that their experts are qualified). A vocational expert is "free to give a bottom line," but the data and reasoning underlying that bottom line must be "available on demand" if the claimant challenges the foundation of the vocational expert's opinions. Donahue, 279 F.3d at 446. "If the basis of the vocational expert's conclusions is questioned at the hearing ... then the ALJ should make an inquiry ... to find out whether the purported expert's conclusions are reliable." Id.

McKinnie v. Barnhart, 368 F.3d 907, 910-911 (7th Cir. 2004). The Tenthc Circuit, on the other

hand, stated:

We are not persuaded by plaintiff's contention that counsel could not adequately cross-examine the vocational expert because her (published) data source was available only by subscription. Counsel could have probed the witness about the source's reliability and acceptance in the profession, but he did not do so, and now our assessment of such matters is effectively foreclosed. … Furthermore, nothing prevented counsel from challenging the expert's figures and conclusions with data available from other, administratively noticed publications, which is a recognized means of discrediting expert vocational testimony.

Gay v. Sullivan, 986 F.2d 1336, 1340 n.2 (10th Cir. 1993). The Tenth Circuit even referenced

20 C.F.R. § 404.1566(d) and (e) (counterpart § 416.966(d) and (e) for Title XVI), which

provides:

(d) Administrative notice of job data. When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of-

(1) Dictionary of Occupational Titles, published by the Department of Labor;

(2) County Business Patterns, published by the Bureau of the Census;

(3) Census Reports, also published by the Bureau of the Census;

(4) Occupational Analyses prepared for the Social Security Administration by various State employment agencies; and

(5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics.

(e)  Use of vocational experts and other specialists.  If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.

Gay, 986 F.2d at 1340 (citing 20 C.F.R. § 416.966(d), (e)).  Plaintiff's counsel chose not to use any of these sources to explore the VE's testimony, instead merely relying on his blanket objection.

If plaintiff intended to challenge the VE's qualifications, he failed to do so.  The ALJ clarified this point of contention with plaintiff's counsel during the hearing.  (R. 50-51).  If plaintiff's counsel was asserting a blanket objection based solely on the fact that the VE did not bring her underlying data (even though she specifically identified what it was ), the Court rejects this argument based on Gay.

Plaintiff also contends the ALJ "had an affirmative duty to ask the VE whether her testimony was consistent with the [Dictionary of Occupational Titles] [("]DOT["]].  He failed to do so." (Dkt. # 15 at 8).  The ALJ did fail to specifically ask the VE during the hearing if the job descriptions were consistent with listings in the Dictionary of Occupational Titles; however, this failure is harmless error since the jobs the VE found could be performed by plaintiff are consistent with the DOT.  In his decision, the ALJ even stated, "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles," clearly showing the ALJ properly considered this issue.  (R. 20).  Plaintiff fails to argue what damage or prejudice was suffered by plaintiff due to this oversight at the hearing, and a review of the DOT categories for each job discloses none.

Plaintiff argues the ALJ failed to perform a Winfrey analysis regarding the mental demands of her past relevant work.  This argument lacks merit.  An ALJ may make the required

<u>Winfrey</u> findings by adopting the VE's testimony.  See <u>Doyal v. Barnhart</u>, 331 F.3d 758, 760-61

(10th Cir. 2003).  In the instant case, the ALJ noted in his step four finding:

> In comparing the claimant's residual functional capacity with the physical and
> mental demands of this work, the undersigned finds that the claimant is able to
> perform it as generally performed.  The claimant's past relevant work would
> require no more than minimal contact with the general public and would require
> no more than simple repetitive tasks with routine supervision.

(R. 19).

## Conclusion

For the above stated reasons, this Court AFFIRMS the Commissioner's denial of

Disability Insurance Benefits.

SO ORDERED this 17th day of January, 2012.


_____
T. Lane Wilson
United States Magistrate Judge